UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW MULLEN,

               Petitioner,

    vs.

R. E. BARNES,

               Movant.

No.  2:13-cv-0165-MCE-EFB P

ORDER AND FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered against him on May 5, 2009 in the Tehama County Superior Court on charges of shooting at an inhabited dwelling, permitting another to discharge a firearm from a vehicle, and participating in a criminal street gang.  The offenses were committed when he was 18 years old.  *People v. Mullen*, No. C062851, 2012 WL 758145, at **1 (Cal.App.3d Dist. March 8, 2012).  The trial court sentenced him to an indeterminate term of 15 years to life.  *Id.*  He seeks federal habeas relief on the following grounds: (1) the trial court violated his federal constitutional rights in denying his motion to suppress his confession; (2) the trial court's improper exclusion of evidence violated his right to due process and to present a complete defense; and (3) the trial court's improper admission of evidence that he refused to consent to a search of his home and his vehicle violated
/////

1

his Fifth Amendment right against self-incrimination.  Upon careful consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.

**I. Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> On appeal, defendant contends (1) the trial court erred in denying his motion to suppress a confession induced by an allegedly improper promise of leniency, (2) the court wrongly excluded expert testimony regarding factors leading to false confessions, (3) the trial court erroneously excluded testimony by a school psychologist regarding defendant's cognitive deficiencies, and (4) evidence of defendant's refusal to consent to a warrantless search of his car and bedroom was improperly introduced.  The Attorney General additionally argues that the trial court erred in failing to impose a mandatory court facilities funding assessment as required by Government Code section 70373.
>
> We conclude that defendant's contentions are without merit but that the court facilities funding assessment must be imposed.  We therefore modify and affirm.

> **FACTUAL AND PROCEDURAL HISTORY**
>
> **The Shooting**
>
> In January 2008, Juan and Cristobal Salazar[1] were living with their mother, Maria de Carmen Flores, in Corning, California.  Flores's bedroom was located closest to the street while Cristobal's bedroom was in the back of the house.
>
> On the evening of January 11, 2008, Eric Sandoval and German Chavez were "hanging out" with Juan and Cristobal in the Salazars' kitchen.  From the kitchen, they saw a gray Volvo and old brown Buick pull up in front of the house.  Ten or eleven people got out of the cars.  Juan, Cristobal, Sandoval, and Chavez went outside.  Juan had grabbed a "big stick," like an ax handle, on the way out.
>
> The people who had gotten out of the cars were yelling insults such as, "We're gonna fuck you up, you fucking scraps," and displaying gang hand signs.  Sandoval recognized some of the people, including Manny Zavala and defendant.  Sandoval had previously

---

[1] We refer to Juan and Cristobal by first name because of their shared surname.  Likewise, we refer to Steven and Michelle Turner by first name.

seen defendant driving the brown car. After five minutes, Zavala, defendant, and the others got back into their two cars and drove away.

About 10 to 30 minutes later, Sandoval left the Salazar house to make a quick trip to a nearby store. When Sandoval returned to his own house, from which he "could see perfect" the Salazar house, he heard gunshots. Sandoval saw defendant's "brown car flying by."

Cristobal was falling asleep in his back bedroom when he heard "[t]hree or more" gunshots. Cristobal noticed "the wall shook a little." Flores heard two or three firecracker noises. She also felt the wall shake in her bedroom. A neighbor testified that he heard a "volley" of five or six gunshots.

Cristobal went outside but did not see any cars in the area. He returned inside and went to the bathroom. In the bathroom, Cristobal saw a hole through the wall as well as a broken shower tile. The shower tile had not previously been broken.

At the time of the shooting, Cristobal was a member of the UBM gang. He testified that UBM stood for "United let's go get high," and is a gang now "dead." Cristobal stated that UBM was not associated with any criminal street gang. Cristobal denied, at the time of trial, that he was a member of the Sureños gang. Juan testified he was not a member of any gang.

Corning Police Officer James White responded to an emergency call about the shooting. He found shell casings from a .45–caliber firearm on the street in front of the Salazar house. Officer White and Officer David Kain found two bullet holes in the wood siding of the house. A detective found a "fired round" on the ground, 15 to 20 feet to the west of the house. Officer White removed one of the damaged shower tiles and recovered a "bullet or slug from a shell."

**Defendant's Questioning**

The next night, around 10:00 p.m. or 10:30 p.m., Officer Kain went to defendant's residence to speak with him. Defendant was not home. Officer Kain spoke with defendant's stepfather, Steven Turner. Officer Kain told Steven "that his son might be in a lot of trouble," and asked Steven to tell defendant that the police needed to talk with him.

Around 2:45 a.m., Officer Kain received a telephone call informing him that defendant arrived at the police station for a "voluntary interview." About 30 minutes later, Officer Kain arrived to find defendant waiting in an interview room without a lock on the door.

Officer Kain told defendant he was free to leave and explained to defendant how to "get out of the Police Department if he chose to leave." Defendant admitted that he owned a brown Oldsmobile. However, defendant repeatedly denied being present or involved in the shooting of the Salazar house.

During the questioning, Officer Kain told defendant that his mother and sister might be subject to arrest for sending him text messages during an investigation.  Officer Kain asked for defendant's consent to search his car and residence.  Defendant refused and attempted to leave the interview room.

Officer Kain informed defendant that he was under arrest and moved him to a locked interview room that is subject to constant video surveillance.[2]  Officer Kain then left defendant to prepare an application for a search warrant.  When the search warrant was authorized, Officer Kain had another police officer search [sic] defendant's car.  The officer found a spent shell casing under the right front passenger seat of the car.  Officer Kain showed the casing to defendant and told him to start thinking about telling the truth.  Officer Kain then went to defendant's house to execute the search warrant.

In defendant's bedroom, Officer Kain found that most of defendant's clothing was red in color or had red highlights.  On the witness stand, Officer Kain acknowledged that the Corning High School's team colors are red and black, and that the school mascot is a cardinal.  In defendant's bedroom, Officer Kain also found a handwritten poem or lyrics with a gang theme.   Defendant's computer was on and showed approximately 20 downloaded songs, some of which had titles related to the Norteño gang or were recorded by artists often favored by gang members.  Defendant's computer also yielded gang-related images including: a Mickey Mouse wearing a red bandana with the letter "N" on it and extending his middle finger with "X4" on it, a person wearing a red bandana holding his fingers in a "14" position, and a group of people wearing red with the title "Norte" on the image.   A username "Matt" had been created for nearly a dozen Web sites with gang and illicit drug themes.

Sometime between 8:30 a.m. and 9:30 a.m., Steven Turner arrived at the police station to see his stepson.  Officer Kain told Steven that defendant was in custody for a shooting and faced a possible 40-year prison sentence.  Officer Kain told Steven "that things would go light on [defendant]; that it would help [defendant] out" if defendant cooperated with the police.  Steven decided to get his wife to talk with defendant, telling Officer Kain: "'If anybody could get [defendant] to talk, [it] would be his mother.'"  Officer Kain responded that "he thought it was a good idea, and to go for it . . . ."

Steven returned to the police station at 10:00 a.m. with defendant's mother, Michelle Turner.  Officer Kain named the charges to be filed against defendant and told them that he was facing 40 years in state prison.  Officer Kain "said if [defendant] cooperated [the court] may go easy on him."  Michelle did not ask Officer Kain what she and her husband could do to help her son.

---

[2] The entirety of Officer Kain's questioning of defendant, along with defendant's meeting with his parents, was tape recorded.  However, a malfunction with the tape recorder rendered both the audio and video unintelligible.

4

Defendant's parents then met with him in the interview room while Officer Kain monitored the conversation from another room. Michelle yelled at defendant, telling him that if she had known this would happen she would have thrown him in the river at birth. She told defendant that if he did not cooperate, he would hurt the entire family. Michelle repeatedly told defendant to "say something" to the police. Defendant appeared sad.

After defendant's parents left, Officer Kain advised defendant of his *Miranda*[3] rights. Defendant appeared to understand his rights and elected to give a statement to Officer Kain. Defendant then stated that he, Manny Zavala, and others went to the Salazar residence because they believed Juan was a member of the Sureño gang. At the residence, they got out of their two vehicles and "call[ed] Juan out." The group yelled "Norte," "scrap," and "fourteen." They got back into their cars and drove to Red Bluff to allow things to cool down in case the police were looking for them. The occupants of defendant's vehicle, of which he knew only Zavala, then developed a plan. They decided to cruise through Corning to find a Sureño to beat up and then shoot. Defendant planned to be the shooter because he was a Norteño "recruit" who wanted to "earn his stripes" in the gang. Their next plan was to return to the Salazar residence to shoot Juan. Finally, they decided to shoot at the Salazar residence.

The group decided that defendant would neither be the driver nor the shooter because he was too intoxicated. Instead, Zavala would drive. After the shooting, defendant disassembled the gun "based upon his Norteño training" and discarded the pieces in different locations.

When defendant was booked into jail, he indicated that he was a Norteño but not a member of a gang.

Criminalist Tom Vasquez analyzed the five cartridges from the pavement and the cartridge case recovered from defendant's car. Vasquez concluded that all the cartridges were fired by the same gun.

Officer Kain testified as an expert on criminal street gangs. He described the origins of the rival Norteño and Sureño gangs; gang clothing and signs; how new members join the gangs and rise in the ranks; the importance of respect, retaliation, and reputation to gang members; and the code of silence. Officer Kain explained that the Norteño gang identifies with the color red, the letter "N," and the number 14. "Norte" is often used as an abbreviation of "Norteño." "Scrap" is "typically a derogatory term use by Norteños toward Sureños."

Officer Kain estimated that there were more than 100 Norteño gang members in Tehama County who engaged in violent crimes such as manslaughter, assaults with a deadly weapon, batteries, robberies, graffiti, and drive-by shootings. He described specific offenses

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

committed by local Norteños, including murder, assault, and a gang drive-by shooting.

Officer Kain discussed items found in defendant's bedroom and car. The predominance of red clothing was consistent with Norteño gang membership.  So, too, a music CD bore cover art with a red color theme suggesting it was gang related.  Defendant also had a brand of sunglasses commonly favored by gang members.  Given a hypothetical based on the facts of the case, Officer Kain opined that the shooting would have been committed for the benefit of the Norteño gang.

The prosecution called Gustavo Gutierrez, Zavala, and Jacob Maldonado as witnesses.  However, none provided testimony that shed any light on the events of the shooting.

To impeach Maldonado's claim of inability to remember anything from the night of the shooting, the prosecution introduced testimony as follows: On January 15, 2008, Officer Kain interviewed Maldonado at the police station.  Maldonado admitted that he accompanied defendant and Zavala during the evening of the shooting.  Maldonado heard defendant yelling "Norte" during the confrontation at the Salazar residence.   During the later shooting, Maldonado was riding in the backseat of defendant's car. Sometime after the interview with Officer Kain, Maldonado told his probation officer that he was in the car with defendant, Zavala, and Gutierrez.  Defendant had obtained a firearm prior to the shooting, racked a round into the chamber, and handed the gun to Gutierrez.

**Defense**

The defense called James Hernandez, a professor of criminal justice, as a witness.   The professor had substantial research experience on the topic of criminal street gangs.  He testified that, according to the Federal Bureau of Investigation's Web site, the Norteños and Sureños are not criminal street gangs.  Instead, the terms refer to "association identities."  Hernandez testified that the images of Mickey Mouse and a person displaying a gang sign, which were found on defendant's computer, could be gang related. He also acknowledged that the confrontation in front of the Salazar house on the night of the shooting, as described in the police report, was consistent with gang activity for the benefit of the Norteños. However, he stated that it was also possible that the activity was not gang related and "just blowin' smoke."

Defendant's mother testified that defendant "had difficulty in school from the beginning, first - or kindergarten, first, and second."  After those school years, defendant "had problems still with reading. [His parents] brought it to the attention of the teachers, and they chose to evaluate him and he was eventually placed in special education."  Then, "[b]etween the first  - fourth grade when he was first placed in special education to seventh grade he made a great improvement; and in special education they re-evaluate them every three years, and at that time it was clear that more - that he'd made great strides in visual and tactile memory, long-term memory, but

6

he had very low scores or very low evaluation in auditory memory skills."

Throughout defendant's teenage years, he had "problems with ability to remember or recall things." His mother explained, "If you give him verbal instructions he doesn't retain them. He has to repeat things. And even then, like if you give him verbal instructions to go do three things, if he gets distracted it doesn't get done, he doesn't remember it."

The defense called Kenneth Killinger, who served as pastor of the Neighborhood Full Gospel Church in Corning. Killinger testified that he had known defendant for seven years. Defendant attended church and youth group outings. He was well behaved and got along with the other teens.

*People v. Mullen*, 2012 WL 758145, at **1-4.

## II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.*  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

2    'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

3    *Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S.

4    652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

5    court, a state prisoner must show that the state court's ruling on the claim being presented in

6    federal court was so lacking in justification that there was an error well understood and

7    comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131

8    S. Ct. at 786-87.

9        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

10    court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

11    527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

12    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

13    2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

14    de novo the constitutional issues raised.").

15        The court looks to the last reasoned state court decision as the basis for the state court

16    judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

17    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

18    previous state court decision, this court may consider both decisions to ascertain the reasoning of

19    the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

20    a federal claim has been presented to a state court and the state court has denied relief, it may be

21    presumed that the state court adjudicated the claim on the merits in the absence of any indication

22    or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85.  This

23    presumption may be overcome by a showing "there is reason to think some other explanation for

24    the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

25    803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

26    but does not expressly address a federal claim, a federal habeas court must presume, subject to

27    rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___,

28    ___, 133 S.Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  *Richter*, 131 S. Ct. at 784.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief."  *Richter*, 131 S. Ct. at 784.  This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id.* at 786.  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

## III. Petitioner's Claims

### A. Petitioner's Confession

In petitioner's first ground for relief, he claims that his statements to police should have been suppressed because they were induced by an improper promise of leniency.  ECF No. 1 at

/////

/////

4.[5]  Specifically, he argues that interrogating officer Sergeant Kain falsely told petitioner's parents that the authorities "would go easy" on him if he cooperated with the police, knowing that they would convey this promise to petitioner in an effort to induce him to confess.  *Id.* at 5-7. Petitioner argues that his confession "was induced by the officer's improper promise of leniency conveyed to petitioner through his parents."  *Id.* at 9.  He explains:

> Petitioner's statement was not voluntary because he made it only after his father told him the police had told him that his chances would be better if he cooperated and after his mother importuned him to give the police something based on Sergeant Kain's statement to her that they would go easy on Petitioner if he cooperated.  It would have been improper for Sergeant Kain to elicit Petitioner's statement directly from him by telling him they may go easier on him if he cooperates.  It was no less improper for him to use Petitioner's parents to achieve the same object.

*Id.* at 7.  Petitioner argues, in effect, that Sergeant Kain improperly used petitioner's parents as agents of the police to obtain a coerced confession from him.  *Id* [6]

### 1. State Court Decision

The California Court of Appeal rejected petitioner's challenges to the admission of his statements to police.  The court recited the following background:

**Claim of Improper Inducement to Falsely Confess**

> [D]efendant argues that Officer Kain improperly induced a false confession by telling his parents that he might receive lenient treatment by the court if he cooperated with the police.  We reject the argument.
>
> **A**
>
> To determine the admissibility of defendant's confession to Officer Kain, the trial court held a hearing outside the jury's presence.  During the hearing, Officer Kain testified that he discussed potential penalties with defendant as follows: "I did not tell [defendant] specifically it was 40 years [in prison].  I told [defendant] that I have investigated cases in the past, and the one

---

[5] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

[6] In his motion to suppress filed in state court, petitioner also argued that his *Miranda* waiver was invalid and that the overall circumstances and tenor of his interrogation rendered his confession involuntary.  Clerk's Transcript on Appeal (CT) at 230, 248, 249-52.  Petitioner does not make those arguments in the petition before this court.

that I investigated in the past, the person that was involved and responsible for the shooting received a 40–year–to–life sentence."

Officer Kain also acknowledged informing defendant that his mother and sister faced their own criminal charges if they attempted to interfere with the investigation:

"Q [¶] . . . [¶] Didn't you tell [defendant] that you could arrest his sister and his mother for interfering because they had texted him?

"A [Officer Kain:]  I don't recall exactly what was said.  But I believe it was furthermore to him - them assisting him and not coming in, or in the destruction or hiding of any evidence."

The record indicates that Officer Kain did not communicate to defendant that the police or court would be lenient with him if he confessed.

At the conclusion of the hearing, the trial court ruled defendant's statements to Officer Kain were not involuntary.  The trial court explained: "The second criteria being whether or not there's a preponderance of evidence indicating that the statements were voluntary, clearly there is always some concern if the Defendant is held for an extended period of time in an interview room.  It's not clear from the evidence whether or not he was handcuffed that whole time.  There is some evidence indicating he was handcuffed at the point when Mr. Turner came into the room.

"Those circumstances in and of themselves do not indicate that the statements Defendant made were involuntary for admissibility purposes.

"As to the involvement of the Defendant's stepfather and mother, it's not entirely clear to the Court what the argument is.  But it does not appear that they were acting as an agent of the police.  It was Mrs. Turner that asked to speak with the Defendant.  It is not, even if we assume that the officer made some statements about 40 years, it does not - the evidence doesn't indicate that that was ever conveyed to the Defendant.  The Defendant did not make any statements to his mother.  There's no indication of coercion that was used by the parents, either on their own behalf or on behalf of the police.

 "Certainly the statements about, you know, they may - what was it? 'They may go easy on him.'  Those are kind of standard statements that are made in an interview.  They certainly don't arise [sic] to the level of a promise of a commitment, and are not statements that suggest involuntariness.

"Given the state of the evidence, the Court finds that for admissibility purposes the statement was not involuntary, and will permit testimony in that regard."

Accordingly, Officer Kain testified at trial about defendant's confession after his mother and stepfather visited him at the police station.

*Mullen*, 2012 WL 758145, at **5-6.

After discussing the applicable standards for claims of an involuntary statement(s), the state appellate court held that record did not show under the totality of the circumstances that his statements were in voluntary.  Of particular significance, that court found Kain's statements to either the defendant or his parents did not link admission to a crime with a guarantee of lenient sentencing or favorable treatment.  Quoting state law precedents, that court noted that:

> "When determining whether a promise of leniency was made, a crucial distinction is drawn between simple police encouragement to tell the truth and the promise of some benefit beyond that which ordinarily results from being truthful.  'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity.  On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible.' (*People v. Hill* (1967) 66 Cal.2d 536, 549.)" (*People v. Vasila* (1995) 38 Cal.App.4th 865, 874.)

> Even if the police improperly convey a promise of leniency, that fact by itself does not necessarily render a confession involuntary. Instead, "an improper promise of leniency does not render a statement involuntary unless, given all the circumstances, the promise was a motivating factor in the giving of the statement." (*People v. Vasila, supra*, 38 Cal.App.4th at p. 874.)  Consequently, we are called to consider whether defendant confessed as a result of a promise of leniency.

> **C**

> Officer Kain did not induce an involuntary confession from defendant with an improper promise of lenient treatment by the court.  Officer Kain urged defendant to "start thinking about telling . . . the truth."  In doing so, Officer Kain did not link confession to a crime with a guarantee of lenient sentencing or favorable treatment by the court.  The requisite linking of a confession with favorable police or judicial treatment is absent from Officer Kain's interactions with defendant.

> True, Officer Kain did mention another investigation in which the suspect eventually received a 40 - year prison sentence.  However, despite mentioning the punishment for the crimes that Officer Kain

was investigating, he did not offer favorable treatment for a confession or admission of criminal culpability.  Instead, he merely urged defendant to tell the truth.  "A confession elicited by any promise of benefit or leniency, whether express or implied, is involuntary and therefore inadmissible, but merely advising a suspect that it would be better to tell the truth, when unaccompanied by either a threat or a promise, does not render a confession involuntary.  [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 600.)

We also do not discern coercion of defendant by Officer Kain's interactions with defendant's parents.  Defendant's parents arrived at the police station unbidden.  His stepfather showed up unannounced, and he was the one who decided to bring defendant's mother to meet with defendant.  Although Officer Kain impressed upon them the seriousness of the crimes being investigated, he did not tell them what they should say to defendant.  Officer Kain was not in the room when defendant met with his parents.

Defendant's parents cannot be considered agents of the police because Officer Kain did not control or direct them.  Officer Kain's admonishment that it would be best if defendant cooperated with the police was neither improper nor overbearing.  Accordingly, "'it is clear that defendant's conversations with his own visitors are not the constitutional equivalent of police interrogation.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 758, quoting *People v. Gallego* (1990) 52 Cal.3d 115, 170.)

In arguing that Officer Kain improperly employed his parents against him, defendant relies on *People v. Hogan* (1982) 31 Cal.3d 815 ( *Hogan* ) [*overruled on another ground* in *People v. Cooper* (1991) 53 Cal.3d 771, 836].  The circumstances presented in *Hogan*, however, distinguish it from this case.  In *Hogan*, the police questioned the suspect two times before they allowed him to speak with his wife.  (*Id.* at pp. 835–836.)  The police employed Hogan's wife against him by priming her with false information that caused her to believe he was probably guilty.  (*Id.* at pp. 836–837.)  On resumption of the police interview, the defendant confessed to murder amid bouts of crying and emotional distress.  (*Id.* at p. 838.)  Having attempted to convince the defendant that he was suffering from a mental illness, the police pointedly offered Hogan mental health treatment if he confessed.  (*Ibid.*)  No more than 10 minutes after the conclusion of the questioning, the police arranged for him to call his wife on the telephone.  The call, which Hogan knew to be recorded, constituted a continuation of the interrogation - and employed Hogan's wife again.  (*Id.* at pp. 828, 842, 843.)  In sum, "the hand of the police was evident in all of Hogan's conversations with his wife during this time period.  Whether wittingly or unwittingly, Hogan's wife acted as an arm of the police, allowing them to continue to interrogate Hogan by means of questions posed by her." (*People v. Terrell* (2006) 141 Cal.App.4th 1371, 1384.)

By contrast, defendant's parents in this case did not act as agents of the police.  Officer Kain neither summoned nor directed them.  Officer Kain's interactions with them were brief and not

14

1
2
3

overbearing.   The police in this case did not provide false information as a way of indirectly instilling fear in defendant.  And, Officer Kain did not offer help or leniency in exchange for a confession of guilt.  (*But compare Hogan, supra*, 31 Cal.3d at pp. 838–839.)

4
5
6
7

The totality of the circumstances indicate that defendant's confession was not coerced by an improper promise of leniency by Officer Kain nor was it the product of the police employing defendant's parents as their agents.  Accordingly, the trial court did not abuse its discretion in denying defendant's motion to suppress the confession.

8

*Mullen*, 2012 WL 758145, at **5-7.

9

### 2.  Applicable Legal Principles

10

The Fourteenth Amendment to the United States Constitution demands that confessions be

11

made voluntarily.  *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972).  In determining whether a

12

confession is voluntary, "the question is 'whether the defendant's will was overborne at the time

13

he confessed.'"  *Haynes v. Washington*, 373 U.S. 503, 513 (1963); *see also Amaya-Ruiz v.*

14

*Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (the test is "whether . . . the government obtained the

15

statement by physical or psychological coercion or by improper inducement so that the suspect's

16

will was overborne.").  "The line of distinction is that at which governing self-direction is lost and

17

compulsion, of whatever nature or however infused, propels or helps to propel the confession."

18

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  "Under the Fourteenth Amendment, a

19

confession is involuntary only if the police use coercive means to undermine the suspect's ability

20

to exercise his free will."  *Pollard v Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002)

21

"There is no 'talismanic definition of 'voluntariness'' that is 'mechanically applicable.'"

22

*Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled in part on other grounds* by

23

*Lockyer v. Andrade*, 538 U.S. 63 (2003) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224

24

(1973)).  Rather, voluntariness is to be determined in light of the totality of the circumstances.

25

*See Miller v. Fenton*, 474 U.S. 104, 112 (1985).  This includes consideration of both the

26

characteristics of the petitioner and the details of the interrogation.  *Schneckloth*, 412 U.S. at 226.

27

The court must examine "the factual circumstances surrounding the confession, assess [ ] the

28

psychological impact on the accused, and evaluate [ ] the legal significance of how the accused

15

1    reacted." *Id.* "Courts . . . often consider the following factors: the youth of the accused, his

2    intelligence, the lack of any advice to the accused of his constitutional rights, the length of

3    detention, the repeated and prolonged nature of the questioning, and the use of physical

4    punishment such as the deprivation of food or sleep." *United States v. Haswood*, 350 F.3d 1024,

5    1027 (9th Cir. 2003).

6        "A confession is involuntary if coerced either by physical intimidation or psychological

7    pressure." *Haswood*, 350 F.3d at 1027.  Officials cannot extract a confession "by any sort of

8    threats or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion

9    of any improper influence." *Hutto*, 429 U.S. at 30 (quoting *Bram v. United States*, 168 U.S. 532,

10   542-43 (1897)).  False promises or threats may render a confession invalid.  *See, e.g., Lynumn v.*

11   *Illinois*, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements

12   that state financial aid for defendant's infant children would be cut off, and her children taken

13   from her, if she did not cooperate); *Rogers v. Richmond*, 365 U.S. 534, 541-45 (1961)

14   (defendant's confession was coerced when it was obtained in response to a police threat to take

15   defendant's wife into custody); *Spano v. New York*, 360 U.S. 315, 323 (1959) (confession found

16   to be coerced where police instructed a friend of the accused to falsely state that petitioner's

17   telephone call had gotten him into trouble, that his job was in jeopardy and that loss of his job

18   would be disastrous to his three children, his wife and his unborn child).

19       However, "misrepresentations made by law enforcement in obtaining a statement, while

20   reprehensible, do[] not necessarily constitute coercive conduct." *Pollard*, 290 F.3d at 1034.

21   Additionally, encouraging a suspect to tell the truth is not coercion.  *Amaya-Ruiz*, 121 F.3d at

22   494.  Nor is it coercive to recite potential penalties or sentences, including the potential penalties

23   for lying to the interviewer.  *Haswood*, 350 F.3d at 1029.

24           **3. Analysis**

25       The trial testimony in this case reflects the following.  Steven Turner, petitioner's

26   stepfather, came to the police station twice on the morning after petitioner turned himself in

27   because he was concerned that petitioner had not yet returned home.  Reporter's Transcript on

28   Appeal (RT) at 129.  The second time Turner arrived at the police station, he had a conversation

16

with Sergeant Kain. *Id.* at 114. He asked Kane why petitioner was still at the police station. *Id.* at 115. Kane responded that petitioner was facing a "significant period of time," and had "better think about cooperating." *Id.* at 114. He also told Mr. Turner that if petitioner cooperated, the District Attorney's office "may be more lenient towards him." *Id.* at 114, 15. Sergeant Kane explained that the police had a search warrant for petitioner's residence. *Id.* at 116. Turner agreed to accompany the police back to the residence. *Id.* at 116.

Sergeant Kain had a further conversation with petitioner's mother and stepfather at their home while the search warrant was being executed. *Id.* at 99. He told them that petitioner was involved in "a very serious matter." *Id.* He stated that in another similar case he worked on, the defendant "received a 40-year-to-life sentence." *Id.* at 104, 113. Sergeant Kain told petitioner's mother that they needed to get truthful responses from petitioner. *Id.* at 116. Kain did not recall telling petitioner's parents that petitioner was facing a 40 year sentence. *Id.* at 117. He stated, "I don't recall ever telling Mr. Mullen or any of his family members that he was going to get a definitive term such as 40 years." *Id.* at 125. Rather, according to Sergeant Kain, he told petitioner's parents that petitioner was "looking at some significant time in prison." *Id.* He also told them it would be in petitioner's "best interest" to cooperate. *Id.*

Steven Turner testified that Sergeant Kain told him petitioner could receive "20, 40 years." *Id.* at 131. Kane explained to Turner that "it was an offense that was really detrimental to [petitioner] and it was serious." *Id.* Sergeant Kane also told Turner that if he could encourage petitioner to cooperate with the police, "it would go in his favor." *Id.* Turner told Sergeant Kain that "if anybody could get [petitioner] to talk, it would be his mother." *Id.* at 132. He told Kain that he "could get [petitioner's mother] to come down and talk to [petitioner]." *Id.*

While the search warrant was being executed at her home, petitioner's mother asked Sergeant Kain if she could see her son at the police station. *Id.* at 138. Kain told her that petitioner was "looking at 40 years," and that if he cooperated "they may go easy on him." *Id.* at 139. When petitioner's mother spoke with petitioner at the police station, she strongly encouraged him to cooperate with the police because she believed what Officer Kain had told her. *Id.* at 141. Petitioner did not admit anything to his mother about his involvement in the crime. *Id.*

17

1  Nor did petitioner's mother discuss petitioner's "cooperation or possible penalty" with Sergeant

2  Kane. *Id.* at 142.

3       While petitioner's parents were speaking with petitioner at the police station, Sergeant

4  Kain was monitoring the video of their conversation from another room. *Id.* at 94.  He observed

5  that petitioner's mother was "trying to elicit [petitioner] to give a truthful response." *Id.* at 117-

6  18.  When petitioner's parents were finished speaking with him, Sergeant Kain escorted them out

7  of the room. *Id.* at 119.  Upon resumption of the police interrogation, petitioner confessed to his

8  role in the crimes.

9       After a review of the relevant record, it appears that petitioner's parents asked to speak

10  with petitioner at the police station and were given permission by Sergeant Kane to do so.  Kain

11  told them or strongly implied that petitioner was facing a significant sentence, possibly 40 years,

12  and that he "might" get more lenient treatment from the courts or the prosecutor if he cooperated

13  with the police.  Kain did not ask petitioner's parents to speak with petitioner, nor did he suggest

14  what they should say to him.  Petitioner's parents, believing that petitioner might get more lenient

15  treatment if he cooperated with police, as Kain had told them, tried to talk petitioner into telling

16  the truth.  Petitioner did not make any incriminating statements to his parents, and there was no

17  exchange of information between petitioner's parents and Sergeant Kain.  However, after talking

18  with his mother, petitioner decided to make a full confession to Sergeant Kain.

19       It would understate the matter to say that Kain did not suggest to petitioner's mother and

20  stepfather, and through them to petitioner, that leniency in exchange for cooperation was a

21  possibility.  But as found by the state court, the record does not support a conclusion that Sergeant

22  Kain linked confession to a crime to a promise of leniency.  Nor does it support a conclusion that

23  he was working directly with petitioner's parents to obtain information from petitioner, or that he

24  directed their conversation with petitioner.  While Kain may have facilitated the conversation

25  between the defendant has his mother--indeed monitored it--in hopes of obtaining evidence,

26  Kain's statements, either to the petitioner or to his parents, did not include any specific offers or

27  promises to induce petitioner's statements.  The distinction between a suggestion of possible

28  leniency for cooperation and an actual offer or promise of leniency is significant.  Kain told the

1    parents that petitioner was facing serious charges carrying substantial penalties and that petitioner

2    "might" receive more lenient treatment by the court or the prosecutor if he cooperated with

3    police.  He did not promise or assure such leniency.  The parents may have been and likely were

4    motivated by hopes inspired by Sergeant Kain's statements to urge petitioner to cooperate with

5    the police, but Kain's actions, when viewed in their entirety, do not rise to the level of coercive

6    police conduct.  *See Amaya-Ruiz*, 121 F.3d at 494; *see also Haswood*, 350 F.3d at 1029.

7           Nor does the evidence reflect that Sergeant Kain used petitioner's parents as his agents to

8    obtain incriminating statements from petitioner.  Rather, Kain presented truthful information to

9    the parents as to the seriousness of petitioner's trouble and the parents decided on their own to put

10   pressure on petitioner to confess.  Kain no doubt was eager to take advantage of that possibility,

11   but the pressure to cooperate came from the parents.  *See Oregon v. Elstad*, 470 U.S. 298, 305

12   (1985) (the Fifth Amendment privilege is not concerned "with moral and psychological pressures

13   to confess emanating from sources other than official coercion"); *Arizona v. Mauro*, 481 U.S.

14   520, 528 (1987) (police did not interrogate defendant in violation of the Fifth and Fourteenth

15   Amendments when they allowed him to speak with his wife in the presence of a police officer

16   because there was "no evidence that the officers sent Mrs. Mauro in to see her husband for the

17   purpose of eliciting incriminating statements"); *United States v. Kimbrough*, 477 F.3d 144, 151

18   (and cases cited therein) (4th Cir. 2007) (police did not subject defendant to improper

19   interrogation when they brought defendant's mother to the basement to see drugs stored there

20   because there was "no evidence in the record of a tacit agreement, discussion, or understanding

21   between the police officers and defendant's mother that she would ask questions or attempt to

22   elicit incriminating information").[7]  *See also Colorado v. Connelly*, 479 U.S. 157 (1986)

23   ("coercive police activity is a necessary predicate to the finding that a confession is not

24   'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").  To

25   the extent that petitioner's will was overborne, it was overborne by the actions of his parents

26   rather than the actions of the police.  The court concludes that this type of non-government

27

28          [7] The court in *Kimbrough* could find no cases "in which statements or confessions elicited
     through private questioning have been suppressed."  *Id.* at 150.

1   pressure does not render petitioner's confession involuntary.  *See Commonwealth v. Doe*, No. 87–

2   1108, 1988 WL 31904 at *4 (9th Cir. March 31, 1988) (unpublished disposition) (holding that

3   responses to police questions coerced by a parent are not involuntary as that term has been

4   defined in *Connelly* ); *United States v. Erving L.*, 147 F.3d 1240, 1251 (10th Cir. 1998)

5   (confession not coerced where defendant's mother told him he should speak with police to clear

6   his conscience and officers did not participate in the conversation or encourage the mother's

7   action in any way).

8         Petitioner does not appear to be arguing that the treatment his parents received at the

9   hands of the police violated their constitutional rights in any way.  In any event, any such claim

10  would fail.  A defendant generally does not have standing to complain about violations of the

11  rights of third parties, unless the government's investigative methods were "offensive to a

12  civilized system of justice" or resulted in a fundamentally unfair trial.  *See Miller v. Fenton*, 474

13  U.S. 104, 109 (1985); *Clanton v. Cooper*, 129 F. 3d 1147, 1157-58 (10th Cir. 1997); *United*

14  *States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984).  That was not the case here.  Under the

15  facts as found by the California Court of Appeal, Officer Kane's treatment of petitioner's parents

16  did not compare to the type of extreme treatment previously found to constitute a due process

17  violation and did not render petitioner's trial fundamentally unfair.

18        His motion to suppress in the trial court argued that the totality of the circumstances of his

19  interrogation rendered his confession involuntary.  He specifically noted that: (1) by 10:30 a.m.

20  on the day after he turned himself in, he had been in custody for over seven hours and was locked

21  in an interrogation room without food or sleep; (2) he was only 19 years old; (3) he had never

22  been placed under arrest and questioned at a police station; (4) he had never been to jail; (5) he

23  had no prior criminal history; and (6) he had learning disabilities and difficulty in processing and

24  recalling information.  CT at 233, 248-49.  However, there is no evidence in the record that these

25  factors caused petitioner's will to be overborne.  Rather, the record reflects that initially the

26  petitioner consistently refused to cooperate or to admit any involvement in the shooting,

27  notwithstanding all of the considerations listed above.  It was not until meeting with his parents

28  /////

1   that things changed.  He decided to cooperate with police immediately after speaking to his

2   parents.

3          As noted, it is true that Sergeant Kain told petitioner he was implicated in a serious crime

4   that carried a possible significant penalty and that he should start thinking about what he was

5   going to say to police interrogators.  *Id.* at 113.  Kain also mentioned to petitioner and to

6   petitioner's parents that he had investigated a similar crime in the past where the person

7   responsible for the shooting received a 40 year-to-life sentence.  *Id.* at 104.  But it is not coercive

8   police conduct to encourage a suspect to tell the truth or to recite potential penalties or sentences.

9   *Haswood*, 350 F.3d at 1029; *Amaya-Ruiz*, 121 F.3d at 494.  The Ninth Circuit has observed that

10  "in most circumstances, speculation that cooperation will benefit the defendant or even promises

11  to recommend leniency are not sufficiently compelling to overbear a defendant's will."  *United*

12  *States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (citing *United States v. Leon Guerrero*, 847

13  F.2d 1363, 1366 n. 5 (9th Cir. 1988); *United States v. Tingle*, 658 F.2d 1332, 1336 n. 5. (9th Cir.

14  1981), and *Collazo v. Estelle*, 940 F.2d 411, 416–19 (9th Cir. 1991) (en banc)).  *See also Fare v.*

15  *Michael C.*, 442 U.S. 707, 727 (1979) ("The police did indeed indicate that a cooperative attitude

16  would be to respondent's benefit, but their remarks in this regard were far from threatening or

17  coercive.").  These statements by Sergeant Kain do not rise to the level of police coercion that

18  would have caused petitioner's will to be overborne.

19         Petitioner has failed to demonstrate that the decision of the California Court of Appeal

20  rejecting his claim that his statements to police were coerced was contrary to or an unreasonable

21  application of United States Supreme Court precedent.  Accordingly, he is not entitled to federal

22  habeas relief on that claim.

23         **B.  Exclusion of Evidence**

24         In his next two grounds for relief, petitioner claims that the trial court violated his due

25  process right to present a complete defense when it excluded testimony from an expert on false

26  confessions and from a school psychologist concerning petitioner's "lifelong cognitive defects."

27  ECF No. 1 at 4, 13-17, 18-22.  Petitioner argues that the testimony of these two witnesses, which

28  /////

1    complemented each other and should have been considered together, was crucial to support his

2    claim that his statements to police were false, involuntary, and unreliable.

3                            **1. Background**

4              Petitioner filed a motion in limine to admit the testimony of Dr. Leo, an expert on false

5    confessions, regarding "the general factors that can lead to an involuntary and/or false confession

6    and the phenomenon of false confession." CT at 188-229.  Petitioner argued in the motion that

7    Dr. Leo's testimony would support his defense theory that his statements to police were "elicited

8    through overzealous use of interrogation tactics such as threats, promises, or other forms of

9    inducements." *Id.* at 190.  Petitioner also argued that his statements to police were "false,

10   involuntary, and unreliable." *Id.* at 193.  He explained that the proffered testimony of Dr. Leo

11   would include "a discussion of the difference between a police interview and a police

12   interrogation, the phenomenon of false confessions, and how various techniques and factors

13   present during police interrogations can lead to a false confession." *Id.*  Petitioner also stated that

14   he intended to offer evidence that "there were coercive techniques and/or forms of suggestive

15   questioning, implied promises of leniency, threats and other police techniques that resulted in

16   unreliable evidence." *Id.* at 198.

17            The trial court denied petitioner's motion to admit Dr. Leo's testimony, finding that it was

18   irrelevant because there was no evidence that petitioner's statements to the police were false.  RT

19   at 147-49.  Specifically, the trial judge ruled that the testimony of these two witnesses was not

20   relevant unless there was "some foundation that in fact there was an unreliable, coercive

21   interview that led to a misstatement by the Defendant." *Id.* at 149.  *See also id.* at 683-87.  The

22   trial court also concluded that expert testimony on false confessions was not necessary because it

23   would not add anything to what the jury would already know from common experience about

24   whether people were telling the truth. *Id.* at 685-86.

25            In the petition before this court, petitioner suggests that Dr. Leo would have testified that

26   petitioner's learning disabilities made him more susceptible to giving a false confession,

27   especially given the circumstances of the police interrogation.  ECF No. 1 at 15.  Petitioner argues

28   that exclusion of Dr. Leo's testimony precluded his trial counsel from demonstrating that some of

the factors present at the police interrogation induced him to falsely confess to the crime.  *Id.*  He

contends that cross-examination of Sergeant Kain and petitioner's parents was insufficient to

make this showing.  In short, petitioner argues that the testimony of an expert on false confessions

was necessary to support his argument that his statements to police were coerced and therefore

unreliable.

Petitioner also made an oral request before the trial court to introduce the testimony of Dr.

Cassorla, a school psychologist at the Tehama County Department of Education.  RT at 708.  He

stated that Dr. Cassorla would provide evidence about petitioner's special needs involving "his

memory problems and his retention problems."  *Id.*  The court denied petitioner's request to call

his school psychologist as a witness because the records he relied on to evaluate petitioner were

too far removed from the time of petitioner's police interrogation to have any relevance to

whether he gave false statements to the police.  *Id.* at 710.  In the petition before this court,

petitioner argues that the exclusion of Dr. Cassorla's testimony undermined his trial counsel's

ability to show that petitioner's disabilities contributed to the giving of a false confession.  ECF

No. 1 at 17.  He contends that the trial court's exclusion of the testimony of Dr. Leo and Dr.

Cassorla "eviscerated his defense," which "depended upon showing that his confession was false,

and induced by police tactics brought to bear on an 18-year-old former special education student

with cognitive deficiencies."  *Id.* at 16-17.

## 2.  State Court Decision and Dissenting Opinion

The California Court of Appeal rejected all of these arguments, reasoning as follows:

> **Exclusion of Testimony by Expert Witness on**
> **False Confessions and Defendant's School Psychologist**
>
> Defendant contends the trial court erred in excluding expert witness
> testimony regarding what leads suspects to make false confessions
> during police interrogations.  Defendant further contends that the
> court erroneously precluded defendant's school psychologist from
> testifying about defendant's deficiencies with memory and
> information retention.  We conclude that exclusion of this evidence
> was not prejudicial error.

/////

/////

23

## A

### Dr. Leo

The defense filed an in limine motion to introduce the testimony of Dr. Richard A. Leo as an expert on false confessions and police interrogation techniques. Specifically, defendant sought to "present expert testimony regarding the general factors that can lead to a coerced and/or false confession and the phenomenon of false confessions . . . ." The motion argued that "[i]ndividually and collectively, especially as the interrogations progressed, these techniques have been shown to unduly influence individuals to make false and/or unreliable statements. This is especially true for individuals who are younger, unsophisticated and who have learning disabilities." The motion noted the extensive literature devoted to the topic of police interrogations: "These sources demonstrate that the proffered expert testimony has gained wide acceptance in the relevant scientific community. The literature further establishes that the information that an expert would convey is beyond the knowledge of the ordinary juror."

The court excluded Dr. Leo's testimony.

### Dr. Cassorla

Defense counsel also sought to introduce the testimony of Dr. Irvin Cassorla, the school psychologist who had formulated defendant's special education curriculum in high school.

At the hearing on the admissibility of Dr. Cassorla's testimony, defense counsel further explained: "He's the school psychologist for the Tehama County Department of Education, and has reviewed as part of setting up a special education program for [defendant], being involved in the evaluations of the reports that were submitted to him and formulating an educational program for [defendant]; and he's reviewed reports from the Corning Elementary School, from the high school, and has to do with the psychol [ sic ] - education and evaluations. We're not gonna[ ] talk about psychology of it; we're gonna [ ] talk about special needs involving - because of his memory problems and his retention problems." Although Dr. Cassorla did not personally examine defendant, "he was part of . . . the examination program to develop a program for [defendant]."

The prosecutor objected to the testimony on grounds that Dr. Cassorla was not qualified to render an opinion based on the school reports and that the testimony would be irrelevant and confusing to the jury. The prosecutor noted that "the most recent of [the school reports] appears to have been prepared in November 2005, so well over two years before the incident alleged in this case."[8]

---

[8] The last report was prepared in 2005. The murder [sic] occurred on January 11, 2008, more than two years later. Also, in January 2008, the defendant was interrogated. The defendant's trial took place in April and May of 2009, more than three years after the 2005 report.

The trial court precluded Dr. Cassorla from testifying.  The court explained: "The primary problem the Court has with it is that it's 2005, it's four years ago, there is testimony from the Defendant's mother indicating that he has problems, but that there was great improvement.  There's testimony that he held two summer jobs at Lassen, he's held a summer job at Les Schwab, he was holding a job at Food Maxx, and the evidence doesn't seem to be pre - adequately probative of his ability as of the time of this interview, which was January of 2008.  I said four years.  It really was three years between - two years?  Whatever, January - from December of 2005 to January of 2008.

"Just - The time gap for me is too great without some indication that that situation continued at the time of the interview.  So at least at this point it would be the Court's ruling that it would not allow the testimony of Dr. or Mr. Cassorla."

**B**

Admitting expert testimony relating to allegedly false confessions is subject to the trial court's discretion.  And we will reverse only if an abuse of discretion is shown.  (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1205 (*Ramos*).)

*Ramos* summarized the law on this subject: "*Crane v. Kentucky* [(1986) ] 476 U.S. [683,] 691 [90 L.Ed.2d 636] is the seminal case in this area.  In *Crane*, a 16–year–old defendant testified at a pretrial motion to suppress that he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession.  In opening statement, defense counsel told the jury the defense would present evidence regarding the length of the interrogation and the manner in which it had been conducted to demonstrate the statement was unworthy of belief.  Prior to the presentation of any evidence, the trial court sustained the prosecutor's objection to the admission of evidence related to the circumstances of the confession.  The trial court ruled the defense could inquire into inconsistencies in the confession but could not present any evidence about the duration of the interrogation or the individuals in attendance on the ground such evidence was relevant only to the issue of voluntariness, which was not before the jury.

"*Crane* held the reliability of a confession and its voluntariness are two separate questions, reliability being a factual issue for the jury and voluntariness being a legal issue for the court.  *Crane* concluded the 'blanket exclusion' of evidence related to the circumstances of the confession deprived the accused of a fair opportunity to present a defense.  (*Crane v. Kentucky, supra*, 476 U.S. at p. 690.)" (*Ramos, supra*, 121 Cal.App.4th at pp. 1205– 1206.)

/////

In *Ramos*, the trial court excluded evidence from the defense's expert on police interrogation techniques and false confessions. On appeal, the *Ramos* court distinguished *Crane* on its facts: "We agree with the principles underlying *Crane* but find the trial court made no similar blanket exclusion in this case. Rather, the record reveals defense counsel cross-examined [the officer] extensively regarding his interrogation techniques used in the interview of Ramos as well as the interrogation techniques used in his questioning of other witnesses. Defense counsel also called witnesses who testified [the officer] threatened them and attempted to coerce statements from them and from Ramos. The jury also was aware of the circumstances of the interrogation based on the videotape of Ramos's statement. Thus, this is not a case like *Crane* where the defense was not permitted to attack the reliability of the defendant's statement." (*Ramos, supra*, 121 Cal.App.4th at p. 1206.)

Here, the circumstances of the questioning were explored in depth during the trial. Officer Kain went to defendant's residence, and defendant later went to the police station for an interview. Defendant admitted facts about his car, but he denied involvement in the crimes. Officer Kain stated that defendant's mother and sister might be subject to arrest for interfering in the investigation. Although, at first, defendant was told he was free to leave, he was later arrested when he refused consent to search his car and home. Officer Kain confronted defendant with the evidence of the shell casing found in his car.

When defendant's parents met with him, he was wearing handcuffs. His mother yelled at him and berated him and told him to talk to the police. After his parents left, defendant waived his *Miranda* rights and gave a responsive and coherent confession that was consistent with the other evidence in the case. In addition to this evidence of the questioning, defendant's mother testified concerning his learning disability.

Turning first to the evidence defendant sought to elicit from Dr. Cassorla, we conclude it was cumulative and, therefore, its exclusion was not an abuse of discretion. (Evid.Code, § 352.) He never personally examined defendant, and the reports upon which he would have based his opinion were over two years old. As noted, the jury was already aware of defendant's learning disorder from his mother's testimony. Even assuming the exclusion of Dr. Cassorla's testimony was an abuse of discretion, defendant suffered no prejudice, as we explain below with respect to exclusion of Dr. Leo's testimony.

Concerning the evidence defendant sought to elicit from Dr. Leo on the subject of false confessions, we conclude that, even if the exclusion was an abuse of discretion, it was not prejudicial.

Defendant contends the error in excluding Dr. Leo's testimony must be measured under the "harmless beyond a reasonable doubt" standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711]. We disagree. The "'"[a]pplication of the ordinary rules of evidence . . .

26

does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 998.)  Thus, the proper test is the state law error standard - whether it is reasonably probable the jury would have returned a more favorable verdict had the expert testimony been admitted. (*People v. Cegers* (1992) 7 Cal.App.4th 988, 1001, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)  In any event, the asserted error was harmless regardless of whether the state or federal test is applied.

Defendant claims that exclusion of Dr. Leo's testimony "eviscerated [his] defense."  The record, however, does not support this claim.

First, the circumstances of the questioning and defendant's confession were fully presented to the jury.  As in *Ramos*, there was no blanket exclusion of evidence concerning the questioning. (*See Ramos, supra*, 121 Cal.App.4th at p. 1206.)

It was obvious that defendant was under stress when he confessed.  And the defense made that point to the jury.

Expert testimony in this regard would not have altered appreciably the jury's perception of the confession.  While Dr. Leo would have testified that stress can make a suspect more compliant, his testimony would not have, and could not have, established that the confession was false.  On the other hand, the trial court's exclusion of Dr. Leo's testimony did not take away from the jury the possibility of finding the confession was false.

Second, and more importantly, except for defendant's initial denial to Officer Kain, the confession was consistent with the remainder of the evidence.  Defendant was with the group that stopped at the Salazar residence about 30 minutes before the shooting.  His car was also there.  A witness saw defendant's car immediately after the shooting.  Another occupant of defendant's car said that defendant was in the car at the time of the shooting.  While defendant attempted to impeach the testimony of these witnesses, the evidence went largely uncontradicted.  A shell casing found in defendant's car was consistent with casings found on the pavement at the scene of the shooting.  There was no evidence that defendant ever recanted his confession and no credible evidence that defendant was anywhere but in the car when the shooting occurred.  Therefore, even if Dr. Leo had testified concerning stress and false confessions, the jury had no factual basis to discount the confession.  Taking into account the totality of the circumstances, the proposed expert testimony was little more than speculation and would not have changed the verdict of a reasonable jury.

We therefore conclude that exclusion of Dr. Leo's testimony was harmless, even assuming the trial court should have admitted it.

*Mullen*, 2012 WL 758145, at **7-10.[9]

---

[9] Justice Butz issued a lengthy dissent to the appellate court's decision that the trial court

### 3. Applicable Legal Principles

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense; this right is "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  *See also Crane v. Kentucky*, 476 U.S. 683, 687, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972); *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009).  Necessary to the realization of this right is the ability to present evidence, including the testimony of witnesses.  *Washington*, 388 U.S. at 19.  However, the constitutional right to present a defense is not absolute.  *Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the state interest is strong."  *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983).

State law rules excluding evidence from criminal trials do not abridge a criminal defendant's right to present a defense unless they are "arbitrary" or "disproportionate to the purposes they were designed to serve" and "infringe[s] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  *See also Crane*, 476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"); *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002).  Further, a criminal defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).  In general, it has taken "unusually compelling circumstances ... to outweigh the strong state interest in administration of its trials." *Perry*, 713 F.2d at 1452.  "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).

/////

/////

---

properly excluded the testimony of Drs. Cassorla and Leo.  *Id.* at **12-17.  Justice Butz agreed with petitioner's argument that the testimony from these witnesses was critical to petitioner's defense and that the exclusion of this evidence resulted in legal prejudice.  *Id.*

28

1           **4. <u>Analysis</u>**

2         As set forth above, the California Court of Appeal ultimately concluded that any error in

3 excluding the testimony of Drs. Leo and Cassorla was not prejudicial because there was no

4 evidence petitioner's statements to police were false.  In the context of federal habeas review, the

5 standard for prejudice resulting from a trial court error is whether the error had substantial and

6 injurious effect or influence in determining the jury's verdict.  *See Brecht v. Abrahamson*, 507

7 U.S. 619, 637 (1993).  Further, "[w]hen a state court has found a constitutional error to be

8 harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state

9 court's determination is objectively unreasonable."  *Towery v. Schriro*, 641 F.3d 300, 307 (9th

10 Cir. 2010).  A state court's decision "based on a factual determination will not be overturned on

11 factual grounds unless objectively unreasonable in light of the evidence presented in the state

12 court proceeding."  *Cooper v. Brown*, 510 F.3d 870, 921 (9th Cir. 2007) (citations omitted).

13         Assuming arguendo that the trial court erred in excluding the testimony of Dr. Leo and Dr.

14 Cassorla on the subject of petitioner's susceptibility to making a false confession, the conclusion

15 of the California Court of Appeal that the error was not prejudicial is not objectively

16 unreasonable.  As explained by the state appellate court, petitioner's confession was fully

17 consistent with the other evidence introduced at his trial.  Petitioner did not recant his confession,

18 rebut the statements of trial witnesses connecting him to the crime, or explain the spent shell

19 casing found in his vehicle.  Nor did he rebut his own statements to police with evidence, such as

20 an alibi, that would have cast doubt on their truthfulness.  Thus, even if the testimony of Drs. Leo

21 and Cassorla could have demonstrated that petitioner was susceptible to making false statements

22 under duress, the evidence demonstrated that, in this case, petitioner did not make false

23 statements.  There was simply no indication from the evidence presented at trial that petitioner

24 had falsely confessed to something he did not do.  Put another way, under the circumstances of

25 this case any error in excluding testimony regarding false confessions could not have had a

26 substantial and injurious effect or influence in determining the jury's verdict because the evidence

27 overwhelmingly showed that petitioner's confession was true.

28 /////

1     This court also notes that the trial judge excluded the testimony of Dr. Leo and Dr.

2 Cassorla pursuant to state law which allows a trial judge to admit or exclude expert testimony in

3 his or her discretion.  As the U.S. Court of Appeals for the Ninth Circuit has observed, the United

4 States Supreme Court has not "squarely addressed" whether a state court's exercise of discretion

5 to exclude testimony violates a criminal defendant's right to present relevant evidence.  *Moses*,

6 555 F.3d at 758-59.  Nor has it clearly established a "controlling legal standard" for evaluating

7 discretionary decisions to exclude the type of evidence at issue here.  *Id.* at 758.  Accordingly, the

8 decision of the California Court of Appeal that the trial court's discretionary evidentiary ruling

9 did not violate the federal constitution is not contrary to or an unreasonable application of clearly

10 established United States Supreme Court precedent and may not be set aside.  *Id.  See also*

11 *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) ("it is not 'an unreasonable application of'

12 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has

13 not been squarely established by [the United States Supreme Court]"); *Wright v. Van Patten*, 552

14 U.S. 120, 126 (2008) (per curiam) (relief is "unauthorized" under Section 2254(d)(1) when the

15 Supreme Court's decisions "given no clear answer to the question presented, let alone one in [the

16 petitioner's] favor," because the state court cannot be said to have unreasonably applied clearly

17 established Federal law); *Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the

18 issuance of *Moses* and the present, the Supreme Court has not decided any case either 'squarely

19 address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

20 or 'establish[ing] a controlling legal standard' for evaluating such exclusions."), *cert. denied* ___

21 U.S. ___, 2011 WL 4901379 (Nov. 14, 2011.)

22     The decision of the California Court of Appeal that the trial court did not commit

23 prejudicial error in excluding the testimony of Drs. Leo and Cassorla is not contrary to or an

24 unreasonable application of United States Supreme Court authority and is certainly not "an error

25 well understood and comprehended in existing law beyond any possibility for fairminded

26 disagreement."  *Richter*,131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to relief on

27 these claims.

28 /////

## C.  Admission of Evidence

In his final claim for relief, petitioner argues that the trial court violated his Fifth Amendment right to remain silent when it admitted testimony by Sergeant Kain that he had refused to allow a search of his car and his residence.  ECF No. 1 at 18, 22-24.  Petitioner argues that this evidence was improperly used as evidence of his guilt and was highlighted for the jury during the prosecutor's closing argument.  *Id.*  He also argues that his trial counsel rendered ineffective assistance in failing to object to this testimony.  *Id.* at 23.

The California Court of Appeal rejected these arguments, reasoning as follows:

> **Evidence and Argument Concerning**
> **Refusal to Consent to Search**
>
> For the first time on appeal, defendant contends that admission of evidence that he refused to give Officer Kain consent to search his car and home violated his constitutional right to remain silent.  This contention was forfeited because no objection was made in the trial court.  Defendant further contends that, if we find the contention was forfeited, we must reverse nonetheless because trial counsel's failure to object to the evidence violated his right to assistance of counsel.  We conclude the failure to object did not violate his right to assistance of counsel because there was a possible tactical reason for not objecting to the evidence and, in any event, the evidence of defendant's guilt was overwhelming.
>
> Officer Kain testified that, during questioning, but before defendant was arrested, he asked defendant for consent to search his car and home.  Defendant refused, so Officer Kain told him he was detaining defendant while he got a search warrant for defendant's car and home.  During closing argument, the prosecutor recounted the questioning.  He stated:
>
> "Prior to [defendant's detention, Officer Kain] had asked [defendant], 'Okay, if you're not involved could I take a look in your car?' because [defendant] had admitted to [Officer] Kain that he drove a brown Oldsmobile which is very similar to the vehicle that was seen at the house.  Turns out of course it was the same vehicle that was seen at the house.
>
> "When [Officer] Kain asked [defendant] for consent to search his car, [defendant] said, 'No.'
>
> "[Officer] Kain asked him, 'Okay, well, is there anything in your residence?  You mind if I take a look in your room?'  Again [defendant] said, 'No, you can't look.'
>
> "At that point [Officer] Kain detained [defendant] and wrote a search warrant.  This search warrant allowed him to search

31

[defendant's] car, which was the brown Oldsmobile, as well as [defendant's] room."

A prosecutor is forbidden to comment on a defendant's refusal to give consent to a search. (*People v. Keener* (1983) 148 Cal.App.3d 73, 78–79.)  Such comment is a violation of the privilege against self-incrimination as secured by the Fifth Amendment to the United States Constitution. (*See Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110].)  However, the failure to object to the comment forfeited review of the issue on appeal. (*People v. Turner* (2004) 34 Cal.4th 406, 421.)

Anticipating the forfeiture problem, defendant argues that defense counsel's failure to object violated his right to assistance of counsel. We disagree.

""""[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citation.]   Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]   Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]"  [Citation.]' [Citation.]"  (*People v. Avena* (1996) 13 Cal.4th 394, 418; fn. omitted.)

""""[I]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.'  Citations.]  A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.  [Citations.]"  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

Defendant claims, summarily, that trial counsel's representation was deficient for not objecting to the evidence that defendant refused consent to searches of his car and home.  He argues only that the law is clear and "[d]efense counsel had no excuse for failing to object to it."  The record does not support this argument.  If defense counsel had a tactical reason not to object, his performance was not deficient.  In fact, here, the defense relied heavily on the evidence that Officer Kain's treatment of defendant was overbearing and heavy-handed.  During closing argument, defense counsel argued, in essence, that Officer Kain had been nice to defendant to try to get him to consent to a search.  When defendant refused, Officer Kain arrested him and searched the car and home anyway.  Defense counsel argued to the jury that Officer Kain arrested defendant "[b]ecause [defendant] wouldn't just roll over and let him go out and search his car."  Therefore, there was a tactical reason defense

32

1
2

> counsel may have decided not to object.[10]   Under these circumstances, defendant has not shown that counsel's representation was deficient.

3
4
5

> Since defendant fails to establish deficient representation, we need not discuss possible prejudice.  In any event, this was not a close case.  Although trial counsel provided a vigorous defense, the evidence, as summarized above, was overwhelming that defendant committed the crimes for which he was convicted.

6

*Mullen*, 2012 WL 758145, at **10-12.

7
8
9
10
11
12

   As set forth above, the California Court of Appeal concluded that petitioner forfeited any claim regarding his refusal to consent to the search of his vehicle and home by failing to make a contemporaneous objection to Sergeant Kain's testimony and to the prosecutor's comments on that testimony during his closing argument.  Respondent argues that the state court's finding of waiver constitutes a state procedural bar precluding this court from addressing the merits of this claim.  ECF No. 13 at 43-45.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

   State courts may decline to review a claim based on a procedural default.  *Wainwright v. Sykes*, 433 U.S. 72 (1977).  As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  The state rule is only "adequate" if it is "firmly established and regularly followed."  *Id.*  (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)); *Bennett v. Mueller*, 322 F 3d 573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and consistently applied.")  The state rule must also be "independent" in that it is not "interwoven with the federal law."  *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983).  Even if the state rule is independent and adequate, the claims may be heard if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2)

27
28

---

   [10] The Attorney General states that "the record does not affirmatively suggest any tactical reason for defense counsel's failure to object, though it is nonetheless conceivable that counsel had such a reason."  We disagree.

1    that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*,

2    501 U.S. at 749-50.  Ineffective assistance of counsel will establish cause to excuse a procedural

3    default if it was "so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*,

4    529 U.S. 446,  451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 486–88 (1986)).

5           Assuming arguendo that petitioner's claim of error is not procedurally barred, it should be

6    denied for lack of prejudice.  It is true, as the California Court of Appeal explained, that a "refusal

7    to consent to a warrantless search is privileged conduct which cannot be considered as evidence

8    of criminal wrongdoing." *United States v. Prescott*, 581 F.2d 1343, 1351–52 (9th Cir. 1978)

9    (defendant's refusal to permit the police to enter her home without a warrant could not be used

10   against her at trial); *see also Gasho v. United States*, 39 F.3d 1420, 1438–39 (9th Cir. 1994)

11   (same).  Accordingly, it was arguably improper for the trial court to admit evidence of petitioner's

12   refusal to consent to a search of his vehicle and his home and for the prosecutor to comment on it.

13   However, the erroneous admission of evidence in violation of the Fifth Amendment's guarantee

14   against self-incrimination is subject to harmless-error analysis.  *Neder v. United States*, 527 U.S.

15   1, 18 (1999) (citing *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (admission into evidence of

16   involuntary confession is subject to harmless error analysis)).  Given the overwhelming evidence

17   against petitioner, including his statements to police and the testimony of witnesses placing him at

18   the scene of the shooting, the admission of evidence that he refused to consent to a search of his

19   vehicle and home would not have had a substantial and injurious effect or influence on the

20   verdict.  *Brecht*, 507 U.S. at 637.

21          Nor is petitioner entitled to relief on his claim that his trial counsel rendered ineffective

22   assistance in failing to object on federal constitutional grounds to the admission of evidence that

23   he refused to consent to a search of his vehicle and home.  As noted by the state appellate court,

24   petitioner's trial counsel may have had a valid tactical reason for allowing this evidence to be

25   admitted without challenge, in order to provide further evidence of Sergeant Kain's heavy-handed

26   dealings with petitioner.  In any event, there is no reasonable likelihood that the outcome of

27   petitioner's trial would have been different had his trial counsel successfully objected to evidence

28   about petitioner's failure to consent to a search.  In light of the overwhelming evidence that

1   petitioner committed the charged crimes, petitioner would have been convicted even if evidence

2   that he refused to consent to a search had not come before the jury.  Accordingly, petitioner is not

3   entitled to relief on his claim of ineffective assistance of counsel.

4        **D.  Motion for Discovery**

5        Petitioner moves for leave to conduct discovery and for the appointment of counsel to

6   assist in conducting discovery.  ECF No. 15.  He summarizes the events that transpired during his

7   police interrogation and requests that he be allowed to "inspect and copy" a wide-ranging list of

8   evidence in the possession of the District Attorney's office, to wit: (1) any prior false reports or

9   statements made by a prosecution witness; (2) "any evidence undermining any prosecution

10  witness' expertise;" (3) any evidence that "contradicts a prosecution witness' statements or

11  reports;" (4) any promise of a reward or favorable treatment to any prosecution witness or that

12  witness' attorney; (5) "any evidence that a prosecution witness has engaged in misconduct which

13  involved moral turpitude;" (6) any misdemeanor convictions suffered by any prosecution witness

14  for crimes of moral turpitude; (7) criminal charges currently pending against any prosecution

15  witness; (8) any evidence of a prosecution witness' reputation for dishonesty; (9) any statement

16  by a prosecution witness evidencing bias toward petitioner; and (10) any evidence supporting "the

17  statements of defense witness."  *Id.* at 11.  Petitioner argues that all of this evidence should be

18  provided to him pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) ("the suppression by the

19  prosecution of evidence favorable to an accused upon request violates due process where the

20  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

21  the prosecution") and *Giglio v. United States*, 405 U.S. 150 (1972) (a violation of a defendant's

22  rights occurs if the government knowingly uses false evidence in obtaining a conviction).

23       In *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011), the United

24  States Supreme Court held that federal review of habeas corpus claims under § 2254(d)(1) is

25  "limited to the record that was before the state court that adjudicated the claim on the merits."

26  131 S. Ct. at 1398.  In the aftermath of *Pinholster*, conducting an evidentiary hearing in a federal

27  habeas proceeding is futile unless the federal habeas court has first determined that the state

28  court's adjudication of the petitioner's claims was contrary to or an unreasonable application of

1    clearly established federal law, and therefore not entitled to deference under § 2254(d)(1), or that

2    the state court unreasonably determined the facts based upon the record before it, and therefore

3    deference is not warranted pursuant to § 2254(d)(2).  Some courts have extended the reasoning in

4    *Pinholster*, which involved a request for an evidentiary hearing, to deny as unwarranted requests

5    for discovery or to expand the record in federal habeas corpus proceedings.  *See*, *e.g.*,

6    *Runningeagle v. Ryan*, 686 F.3d 758, 773-74 (9th Cir. 2012) (concluding that, under *Pinholster*,

7    petitioner was not entitled to discovery); *Peraza v. Campbell*, 462 F. App'x. 700, 701, 2011 WL

8    6367663, 1 (9th Cir. 2011) ("In summary, to the extent Peraza seeks to expand the record through

9    discovery and an evidentiary hearing, beyond what was presented to the state court, we conclude

10   that such relief is precluded by *Pinholster* . . . ."); *Coddington v. Martel*, No. S-01-1290 KJM

11   CKD, 2013 WL 5486801 (E.D. Cal. Sept. 30, 2013).  Other courts have reached the contrary

12   conclusion.  *See, e.g., Sample v. Colson*, F. Supp. 2d 865,  889 (W.D. Tenn. 2013) ("[g]iven the

13   lack of direct guidance from the Supreme Court or the Sixth Circuit on the breadth of *Pinholster*,

14   the Court will follow the plain language of *Pinholster* and limit its force to § 2254 habeas

15   review"); *Pike v. Johnson*, No. 1:12–cv–35, 2013 WL 2457718, at *3 (E.D. Tenn. June 6, 2013)

16   ("[w]hile *Cullen v. Pinholster* limits the scope of review under § 2254(d)(1), it says nothing about

17   the court's discretion to allow discovery").

18          Regardless of whether *Pinholster* presents an impediment to expansion of the record

19   absent the preliminary finding that the decision of the state court is not entitled to deference under

20   § 2254(d)(1) or (2), petitioner here is not entitled to the discovery requested in his motion.  Rule 6

21   of the Rules Governing Section 2254 cases provides in pertinent part:

22                  (a) Leave of Court Required.  A judge may, for good cause,
                    authorize a party to conduct discovery under the Federal Rules of
23                  Civil Procedure and may limit the extent of discovery....

24                  (b) Requesting Discovery.  A party requesting discovery must
                    provide reasons for the request. The request must also ... specify
25                  any requested documents.

26   Thus, a habeas petitioner is not entitled to discovery as a matter of course, but only upon a fact-

27   specific showing of good cause and in the court's exercise of discretion.  *Bracy v. Gramley*, 520

28   U.S. 899 (1997); *Harris v. Nelson*, 394 U.S. 286 (1969); *Rich v. Calderon*, 187 F.3d 1064, 1068

1    (9th Cir. 1999) (discovery is available "only in the discretion of the court and for good cause");

2    *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997).  The burden of demonstrating the materiality

3    of the information requested is on the moving party.  *Stanford v. Parker*, 266 F.3d 442, 461 (6th

4    Cir. 2001) (citing *Murphy v. Johnson*, 205 F.3d 809, 813–15 (5th Cir. 2000)).  "Bald assertions

5    and conclusory allegations do not provide sufficient ground to warrant requiring the state to

6    respond to discovery or require an evidentiary hearing."  *Parker*, 266 F.3d at 460.  Good cause

7    exists "where specific allegations before the court show reason to believe that the petitioner may,

8    if the facts are fully developed, be able to demonstrate that he is entitled to relief.  *Bracy*, 520

9    U.S. at 908–09.

10        Petitioner has failed to demonstrate good cause for the discovery sought here.  He also has

11   failed to support his requests with the required specificity and has not explained how the

12   discovery would have any bearing on the claims before this court.  Nor does he explain why the

13   discovery that he now seeks is any different from the discovery that was available to him in state

14   court.  It is entirely possible that petitioner's trial counsel conducted the same investigation that

15   petitioner now seeks to undertake through his discovery motion and found it unproductive, or

16   decided that the discovery was not material to the defense.  Petitioner is essentially seeking

17   discovery on the chance that it will provide helpful information in support of his federal habeas

18   claims.  The habeas discovery rules do not permit such a wide ranging exercise, nor do they allow

19   a petitioner to investigate his case anew after he has been convicted.  Habeas petitioners may not

20   seek to use discovery as a "fishing expedition . . . to explore their case in search of its existence."

21   *Rich*, 187 F.3d at 1067 (quoting *Calderon v. U.S.D.C. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir.

22   1996)).  *See also Kemp v. Ryan*, 638 F.3d 1245, 1260 (9th Cir. 2011) (the desire to engage in a

23   "fishing expedition" cannot supply good cause to conduct discovery).  Similarly, "good cause for

24   discovery cannot arise from mere speculation" and "discovery cannot be ordered on the basis of

25   pure hypothesis."  *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006).

26        Finally, and most important, this court has concluded that none of petitioner's habeas

27   claims are meritorious.  Petitioner has not convinced the court that any of the discovery that he

28   seeks would entitle him to federal habeas relief on any claim.  Nor has petitioner demonstrated a

1  "reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is

2  confined illegally and is therefore entitled to relief." *Harris v. Nelson*, 394 U.S. 286, 300 (1969).

3  In short, there is no good cause to conduct further discovery with respect to any of petitioner's

4  habeas claims at this time.

5  **IV. Conclusion**

6        Accordingly, IT IS HEREBY ordered that petitioner's May 28, 2013 motion for discovery

7  (ECF No. 15) is denied.

8        Further, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

9  habeas corpus be denied.

10        These findings and recommendations are submitted to the United States District Judge

11  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

12  after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within fourteen days after service of the objections.  Failure to file

16  objections within the specified time may waive the right to appeal the District Court's order.

17  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

18  1991).  In his objections petitioner may address whether a certificate of appealability should issue

19  in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

20  2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

21  final order adverse to the applicant).

22  DATED:  April 30, 2015.

23                                EDMUND F. BRENNAN

24                                UNITED STATES MAGISTRATE JUDGE

25

26

27

28